UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEKABANK DEUTSCHE GIROZENTRALE,

                              Plaintiff,

       v.

BLACKSTONE PROPERTY PARTNERS
LOWER FUND 1 L.P.,

                        Defendant.

Index No.  25-cv-9958

**COMPLAINT**

Plaintiff DekaBank Deutsche Girozentrale ("Plaintiff" or "Deka" or "Lender"), by and through its undersigned counsel, as and for its complaint against Defendant Blackstone Property Partners Lower Fund 1 L.P. ("Guarantor" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.     This case is about willful disregard of contractual duties that inflicted massive, avoidable damage on a landmark Seattle office tower and a calculated attempt to foist the consequences onto Lender. In 2017, Guarantor's affiliate, BPP Exchange Building Property Owner LLC ("Borrower"), obtained a loan from Lender to finance the Exchange Building ("Property") in Seattle, Washington. The loan documents obligated Borrower to protect Lender's collateral for the loan by, among other things, promptly repairing any damage to the Property, and maintaining the Property in a manner comparable to other Class-A office buildings. Borrower hired its affiliate Equity Office Management, L.L.C. ("Property Manager") to carry out those obligations pursuant to a property management agreement ("Property Management Agreement"), Guarantor, for its part, guaranteed those obligations. Borrower and Guarantor failed deliberately to satisfy their obligations.

2.    Specifically, Lender has discovered that for years Borrower failed to repair and maintain the Property with respect to significant and persistent water intrusions through the Property's windows and walls that required a comprehensive repair of the Property's façade and windows.  Instead, more concerned with its bottom line than the state of the Property, Borrower knowingly deferred (and to date has never completed) maintenance that would have prevented or mitigated this water damage to the Property.

3.    The results of Borrower's inaction have been disastrous. In the course of only a few years, the Property's façade suffered substantial water damage, which alone will cost almost $15 million to repair. In total, over $17 million in immediate and short-term repairs are required due to Borrower's inaction and failure to maintain or repair the Property. Borrower never informed Lender of this damage to the Property, nor the repairs that might be required for the property.

4.    Lender only discovered the full scope of this damage to the Property in 2025, when Lender commissioned a property condition assessment.

5.    On August 5, 2025, Lender put Borrower on notice of the damage to the Property and gave Borrower thirty (30) days to cure its breach of the applicable loan documents by undertaking repairs to the Property. In response, Borrower did nothing. Consequently, on September 5, 2025, Lender declared an additional default under its loan, and demanded that Guarantor fulfill its contractual obligations and pay certain amounts to remedy the situation created by Borrower. Guarantor did nothing. Borrower and Guarantor therefore have left Lender no choice but to bring this action to recover against Guarantor under two guaranties executed for Lender's benefit.

6.    The first guaranty at issue is a Recourse Guaranty, dated September 12, 2017 ("Recourse Guaranty"). Under the Recourse Guaranty, Guarantor agreed to indemnify Lender for

all of its out-of-pocket losses in connection with certain bad acts by Borrower or its affiliates at the Property. One such bad act was any "willful misconduct by Borrower, any Borrower Affiliate or Guarantor which results in physical damage or waste to the [Property]." Borrower's purposeful inaction at the Property, allowing it to knowingly fall into waste, renders Guarantor liable under the Recourse Guaranty for these repair costs that now will have to be borne by Lender.

7.     The second guaranty is a Carry Guaranty, dated September 9, 2022 ("Carry Guaranty"). Under the Carry Guaranty, Guarantor agreed to be responsible for the payment of the Property's operating expenses, debt service and tenant improvements/leasing commissions until the Carry Guaranty's expiration. As is relevant for this action, the Carry Guaranty could only expire if Guarantor satisfied eighteen different tender requirements to tender Borrower's ownership interest in the Property to Lender.

8.      The eighteen tender requirements detailed in the Carry Guaranty are intended to ensure that Lender can take the Property free and clear of any unexpected encumbrances or expenses. Thus, for Guarantor to satisfy the tender requirements under the Carry Guaranty, Guarantor was required to, among other things, (i) deliver to Lender a certification by Borrower that there were no unpaid expenses for which Borrower is responsible relating to the Property, and (ii) pay all amounts owed by Guarantor under any guaranty at the Property.

9.     In late 2023, Guarantor attempted to exercise the tender to escape ongoing obligations under the Carry Guaranty, including liability for a significant portion of the looming repayment of the loan, which was maturing in September 2024.

10.    While Lender confirmed receipt of Guarantor's submission of documents in connection with Guarantor's attempted satisfaction of the tender requirements, it did not confirm the satisfaction of the tender requirements (nor did it accept the tender). Instead, Lender informed

Guarantor that it would perform due diligence at the Property, which was necessary to confirm whether: (i) the certification from Borrower that there exist no unpaid expenses relating to the Property was accurate, and ultimately (ii) the tender was proper and could be accepted by Lender.

11.     It was during this due diligence process at the Property that Lender discovered the pervasive water damage that Borrower knowingly and willfully failed to remedy.  Consequently, Guarantor never validly satisfied the tender requirements under the Carry Guaranty because (i) Borrower's certification concerning the lack of outstanding expenses at the Property was false, and (ii) Guarantor did not pay all amounts owed under the Recourse Guaranty.

12.     Because Guarantor never satisfied the tender requirements, the Carry Guaranty remains in effect and Guarantor remains responsible for paying, among other things, the Debt Service at the Property. This obligation now includes the entire amount of the underlying loan— which matured in September 2024—subject only to the Carry Guaranty's cap on Guarantor's liability, which limits Guarantor's liability to $30 million (plus enforcement costs).  In addition, Guarantor is liable under the Recourse Guaranty for at least $17 million in damages incurred by Borrower on account of its willful failure to maintain and repair the Property, resulting in waste.

13.     In light of the foregoing, Lender has incurred at least $47 million in damages under the loan for which the Guarantor remains liable under the Recourse Guaranty and Carry Guaranty. Lender is entitled to recover these amounts from Guarantor because Borrower intentionally shirked its obligations, causing the Property to fall into waste, and Guarantor's only response was to try to invalidly exercise tender rights under the Carry Guaranty and leave Lender responsible for the Property's impaired condition.  This Court must remedy Guarantor's wrongful acts.

## PARTIES

14.     Plaintiff DekaBank Deutsche Girozentrale is a foreign, German corporation, with its headquarters located in Frankfurt, Germany.

15.     Defendant Blackstone Property Partners Lower Fund 1 L.P. is a Delaware limited partnership with its principal place of business located at 222 South Riverside Plaza, Suite 2000, Chicago, Illinois 60606.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to New York Civil Practice Laws and Rules ("CPLR") § 301.

17.     Venue is proper in this Court pursuant to CPLR § 501 because the Recourse Guaranty and Carry Guaranty fix venue in this Court.

## FACTUAL ALLEGATIONS

**A.     Lender, Borrower and Guarantor Enter into the Original Loan Documents**

18.     The Property, located at 821 Second Avenue, Seattle, WA 98104 (Lots 1, 2 and 4, Block 8), is a 23-story Art Deco office building located in the central business district of Seattle, Washington.  The Property was completed in 1930, and it was granted landmark status in Seattle in 1990.

19.     On September 12, 2017, Borrower took out a loan in the amount of $97,100,000.00 (the "Original Loan") from Lender, secured by the Property.   This Original Loan was evidenced by, among other things, (i) a promissory note, dated September 12, 2017 (the "Original Promissory Note"), (ii) a term loan agreement, dated September 12, 2017 (the "Original Loan Agreement"), and a (iii) deed of trust, assignment of rents and leases, security agreement and fixture filing, dated

September 12, 2017 (the "<u>Deed of Trust</u>"), as well as other attendant loan documents (the "<u>Original</u> <u>Loan Documents</u>").

20.    Simultaneously, Borrower and Property Manager entered into the Property Management Agreement.  Pursuant to Section 2.2 of the Property Management Agreement, Property Manager was obligated to "manage, repair, maintain and operate the Property in the best interests of [Borrower], in an efficient manner, in good faith and diligently in accordance with sound, reasonable and prudent property management practices, in compliance with applicable law, equal to the standard of care provided by office management companies for similar buildings and properties of similar quality located in the near vicinity of such building."

21.    Borrower also assigned the Property Management Agreement to Lender. The assignment "inure[d] to the benefit of Borrower, [Property] Manager and [Lender] (for the benefit of the Banks) and their respective successors and assigns forever."

22.    The Original Loan had a maturity date of September 12, 2022.

23.    At the same time, Borrower and Lender entered into the Original Loan, Guarantor also executed the Recourse Guaranty, in favor of Lender.

24.    This Recourse Guaranty defines certain events and bad acts as Limited Recourse Obligations, whereby Guarantor is "fully and personally liable for, and shall defend, indemnify and hold harmless [Lender] from and against, any actual out-of-pocket loss, cost (including reasonable attorneys' fees and expenses), expense, claim, liability, judgment, award, obligation, penalty, action, suit, disbursement or damage suffered by [Lender]."

25.    One such Limited Recourse Obligation is Guarantor's agreement to be liable to, and indemnify, Lender for any losses because of "willful misconduct by Borrower, any Borrower Affiliate or Guarantor which results in physical damage or waste to the Project." Notably, the

6

willful misconduct is not limited to just Borrower; it is also applicable to any Borrower Affiliate, such as the Property Manager.

26.     The Recourse Guaranty is absolute, with Guarantor "absolutely, unconditionally and irrevocably guarantee[ing] to [Lender], the prompt, full and complete payment and/or performance of the Limited Recourse Obligations and the Full Recourse Obligations, as applicable, and agree[ing] to pay any and all reasonable out-of-pocket expenses (including reasonable counsel fees and expenses) actually incurred by [Lender] in enforcing any rights under this [Recourse] Guaranty (such expenses, together with all of the Limited Recourse Obligations and all of the Full Recourse Obligations, being the 'Guaranteed Obligations')."

27.     Guarantor further agreed that if Borrower failed to pay the Guaranteed Obligations "when due and owing," then "Guarantor will promptly pay the same, upon written demand . . . no later than ten (10) Business Days following the giving of a written demand therefor."

28.     The Original Loan Documents governed Borrower's and Guarantor's obligations towards the Property for almost five years. During this time, Borrower operated the Property and did not notify Lender of any significant problems with the Property.

**B.      The Parties Amend the Loan Documents**

29.     In or around 2022, Borrower, Guarantor and Lender began discussing an extension of the Original Loan, which was to mature that September.

30.     Ultimately, Lender agreed with Borrower and Guarantor to amend and extend the Original Loan (the "Amended Loan").

31.     To that end, on September 9, 2022, Lender and Borrower entered into (i) an amended and restated term loan agreement (the "Amended Loan Agreement"), (ii) an amended and restated promissory note (the "Amended Note"), in the amount of $89,650,000.00, and (iii) an

omnibus amendment and ratification agreement (the "Amendment Agreement"), as well as attendant loan documents (the "Amended Loan Documents"). These Amended Loan Documents extended the maturity of the Original Loan from September 12, 2022 to September 9, 2024 (the "Amended Loan").

32.    Importantly, the Amendment Agreement specifically provided that all Original Loan Documents, not otherwise modified, would continue to be in full force and effect and continue to apply to the Amended Loan. This included the assignment of the Property Management Agreement, which was subject to the Amendment Agreement, and specifically provided that the assignment shall be binding upon and inure to the benefit of Lender.

33.    This means that Property Manager, an affiliate of Borrower, had duties to maintain the Property for the benefit of Lender. Those duties included managing, repairing, and operating the Property "in an efficient manner, in good faith and diligently in accordance with sound, reasonable and prudent property management practices, in compliance with applicable law, equal to the standard of care provided by office management companies for similar buildings and properties of similar quality located in the near vicinity of such buildings." (Property Management Agreement, Section 2.2).

34.    Property Manager was specifically obligated to "maintain…the Property, building and common areas thereof, external and internal…in good and clean condition and repair, and provide for the furnishings of all utilities, vermin extermination, trash removal, janitorial and other necessary services…" (*Id*., § 2.2(b)). Property Manager was also obligated to engage and supervise any contractors for the provision of utilities and services as may be necessary in the normal and ordinary course of managing and operating the Property. (*Id.*, § 2.2 (c)). Finally, Property Manager was required to inform Borrower, and give notice to Borrower, of all relevant information relating

to the Property (*Id.*, § 2.2 (j)) and promptly investigate and give notice to Borrower of any damage to the Property (*Id.*, § 6.2 (e)).

35.     When Borrower and Lender entered into the Amended Loan, Lender and Guarantor also entered into the brand-new Carry Guaranty, to supplement the Recourse Guaranty, which remained in effect.

36.     Pursuant to Section 2(a) of the Carry Guaranty, Guarantor guarantees "the full payment of (i) all Operating Expenses incurred in connection with the customary operation of the Project (including all real estate taxes and assessments and insurance premiums for the insurance coverages required pursuant to the terms of the Loan Agreement), (ii) Debt Service and (iii) TI/LC Expenses, in each case, as and when the same become due and payable and prior to delinquency solely to the extent Operating Revenue is not otherwise sufficient to pay items (i), (ii) and/or (iii), regardless of whether the Maturity Date has occurred or whether there has been an acceleration of the Loan and solely to the extent that such amounts are due and payable prior to the Carry Guaranty Expiration Date . . . ."

37.     Just like the Recourse Guaranty, the Carry Guaranty is absolute, with Guarantor "irrevocably and unconditionally guarantee[ing] to [Lender] and its successors and assigns the payment of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise, in accordance with and subject to the terms of this Guaranty."

38.     That said, Section 2(b) of the Carry Guaranty set forth conditions under which the Carry Guaranty can expire, set forth here:

> [T]he term "**Carry Guaranty Expiration Date**" means the earliest to occur of the following: (i) Borrower and/or Guarantor has made payments in an aggregate amount of the Carry Guaranty Cap of (x) all Operating Expenses incurred in connection with the customary operation of the Project (including all real estate

taxes and assessments and insurance premiums for the insurance coverages as expressly required pursuant to the terms of the Loan Agreement), (y) Debt Service and (z) TI/LC Expenses, in each case which amounts are in excess of Operating Revenue, (ii) the indefeasible payment in full of the Loan, (iii) the date upon which Agent (or its nominee) or any other third party acquires title to the Project via completion of a foreclosure of the Mortgage or by acceptance of a deed-in-lieu of foreclosure of the Mortgage (regardless of whether or not the Tender Requirements (as defined in Exhibit A attached hereto) have been satisfied), or (iv) the date upon which the Tender Requirements have been satisfied.

Carry Guaranty § 2(b). In general, these conditions seek to limit Guarantor's exposure once Borrower repays the Loan or the Property is transferred to Lender (by foreclosure or the acceptance of a deed-in-lieu of foreclosure).

39.     The Carry Guaranty Cap limits Guarantor's potential exposure under the Carry Guaranty to "$30,000,000.00 . . . plus all reasonable out-of-pocket costs and expenses (including court costs, reasonable attorneys' fees, investigative costs and all other reasonable out-of-pocket costs and expenses actually incurred by [Lender] in the enforcement of or preservation of [Lender's] rights under this Guaranty)."

40.     In addition, under Section 2(b)(iv), Guarantor could cause the Carry Guaranty to expire by meeting the Tender Requirements set forth in Exhibit A to the Carry Guaranty. The Tender Requirements consist of eighteen (18) different conditions that Guarantor would have to meet to successfully cause the Carry Guaranty to expire. These conditions include, among other things, the requirements that Guarantor deliver: "(ii) [a] grant deed, with covenants against grantor's acts, conveying to Agent or its nominee or designee … , Borrower's interests in the Property, subject to no liens or encumbrances other than the respective liens of the Mortgage and the other Loan Documents, as applicable, any lis pendens filed by Agent, the exceptions set forth in Agent's title insurance policy, or which are otherwise specifically approved of by Agent in writing from time to time during the term of the Loan, and any standard printed exceptions in

Agent's title insurance policy…" and "(viii) [a] certification from Borrower (which is subject to verification by Agent as to its accuracy) that there exist no expenses for which Borrower or any Affiliate of Borrower is responsible, whether for capital items or Operating Expenses, relating to the Property, which are unpaid . . . ," and "(xvii) All sums then due and payable as of the tender date under this Guaranty and, without duplication of the amounts paid hereunder, each other Guaranty (as defined in the Loan Agreement). Within five (5) Business Days of Borrower's request, Agent shall give notice to Borrower of Agent's calculations of Guarantor's Guaranteed Obligations hereunder and under each other Guaranty, in each case with respect to amounts then due and payable under such Guaranty, which shall be in reasonable detail and shall include a per diem amount and Agent's reasonable basis therefor which shall remain effective for not less than fifteen (15) days, subject to interest rate changes in the interim."

41.    The Tender Requirements also require Guarantor to provide Lender a grant deed granting Borrower's interest in the Property to Lender, an updated title commitment, a full release of Lender, and a certification that Borrower had not improperly transferred the management, leasing or service contracts in violation of the Amended Loan Agreement.

42.    The plain intent of these Tender Requirements is to make certain that if Guarantor was exercising the tender, Lender would not be saddled with a Property impaired by the bad acts or omissions of Borrower. Indeed, the Tender Requirements sought to ensure that Lender had received all amounts owed by Guarantor (under both the Carry Guaranty and the Recourse Guaranty) and that the Property would not be impaired by any unexpected expenses, liens, or other complications.

43.     If, and only if, Guarantor met all eighteen (18) Tender Requirements—subject to Lender's due diligence and confirmation of compliance—would the Carry Guaranty expire pursuant to Section 2(b)(iv) of the Carry Guaranty.

**C.     Guarantor Attempts to Tender**

44.     A year after executing the Amended Loan, Borrower and Guarantor indicated to Lender that Guarantor was interested in satisfying the tender requirements under Section 2(b)(iv) of the Carry Guaranty.

45.     Upon information and belief, at the time Guarantor first expressed its interest in satisfying the tender requirements, Guarantor knew that Borrower was going to incur a payment maturity default and Guarantor therefore desired to cutoff its potential liability under the Carry Guaranty.

46.     Accordingly, in late 2023, Guarantor took steps to effectuate tender.  This included providing to Lender, among other things, a bargain and sale deed in lieu of foreclosure (although Tender Requirement (ii) required a grant deed), a title report, and other required certifications, including a certification that "there exist no expenses for which Borrower or any Affiliate of Borrower is responsible, whether for capital items or Operating Expenses, relating to the Project, which are unpaid and in respect of which [Lender] is obliged to assume liability."

47.     However, at the time of this purported tender, Guarantor did not deliver the correct type of deed as required by Tender Requirement (ii), nor did Guarantor pay any of the amounts owed under the Carry Guaranty or Recourse Guaranty.  Therefore, Guarantor could not have paid "[a]ll sums then due and payable as of the tender date under this Guaranty and, without duplication of the amounts paid hereunder, each other Guaranty," as required by Tender Requirement (xviii).

48.     Ultimately, Lender determined that Borrower's certification that there existed "no [unpaid] expense for which Borrower or any Affiliate of Borrower is responsible" was false. Therefore, Guarantor also failed to comply with this Tender Requirement.

49.     Because Guarantor failed to meet at least three of the Tender Requirements in December 2023, it failed to properly satisfy the tender requirements set forth in Section 2(b) (iv) of the Carry Guaranty.

50.     At no time did Lender either accept the Property or agree that Guarantor had successfully caused the Carry Guaranty to expire.  Instead, Lender determined that it needed to perform diligence at the Property to understand Guarantor's purported tender and the state of the Property.

**D.     Lender Investigates the Property and Discovers Widespread Damage**

51.     Following Guarantor's attempted tender, Lender refused to execute the bargain and sale deed in lieu of foreclosure for the Property and Lender has not taken possession of the Property.

52.     To date, Borrower remains the owner of the Property and its affiliate, Perform Properties (as successor-in-interest to Equity Office Management, L.L.C.), remains the Property Manager.

53.     Following Guarantor's purported tender, Lender began performing due diligence at the Property to confirm the veracity of Borrower's certifications in connection with the purported tender and to assess the condition of the Property. This due diligence took time, as Lender needed to undertake, among other things, a new property condition assessment at the Property.

54.     Lender consistently informed Borrower and Guarantor that it was performing due diligence at the Property, that it was not taking possession of the Property in the interim and that Borrower remained the owner of the Property.

55.     While Lender pursued due diligence at the Property, the Amended Loan matured on September 9, 2024.

56.     Borrower did not repay the Amended Loan upon maturity, which constituted a clear Event of Default under the Amended Loan Agreement and other Amended Loan Documents.

57.     Around this same time, Lender and its representatives retained EBI Consulting ("EBI") to perform a property condition assessment (the "PCA") at the Property.  EBI's PCA was intended to explore whether the Property remained in good condition and whether Borrower's representations concerning the Property were accurate.

58.     Lender informed Borrower on or around February 5, 2025 that EBI would be visiting the Property to perform its assessment. Thereafter, EBI visited the Property and, while carrying out its assessment, it examined different portions of the Property, interviewed management concerning the Property and its condition, and performed a number of tests at the Property.

59.     EBI's PCA was wide-ranging and included EBI's evaluation of, among other things, the Property's site, structure, building envelope (including roofing, facades, and windows), interior, accessibility, plumbing, HVAC, electrical, fire protection, and elevators.  EBI also commissioned a façade condition assessment report for the Property from Wiss, Janney, Elstner Associates, Inc. ("WJE").

60.     The results of EBI's PCA were shocking. Far from being in "good condition," EBI's PCA revealed that the Property had suffered substantial damage, particularly to its façade.

61.     EBI found that the Property required an astounding $17,213,943 in immediate and short-term repairs, with an additional $13,126,856 required in inflated reserves.

62.     Most of the immediate and short-term repairs were necessary to address the Property's façade, which required over $14 million in immediate and short-term repairs. These repairs were needed because portions of the façade were "exhibiting deficiencies and evidence of deferred maintenance."  In fact, EBI concluded that regarding the Property's façade "the deferred maintenance issues are reasonably obvious and have likely been evident for five years or more."

63.     EBI's conclusions were not surprising given that WJE, in its façade condition assessment survey, found that water was able to infiltrate the Property in a number of different test locations.

64.     Further, as part of its survey, WJE interviewed the chief engineer at the Property, who revealed that he was aware of active leaks at the Property on the 4th, 5th, 16th, 18th, and 21st floors of the Property.

65.     The Property Manager also confirmed for WJE that there had been water leakage issues through the windows and walls of the Property since at least 2018.  EBI found that, "[a]t some locations, the deterioration [of the windows] is aged and is suspected to have been easily noticeable five years ago or longer." Worse, the Property Manager confirmed that the maintenance performed by Borrower had been "reactive and 'band-aid' repairs," with no comprehensive repairs performed.

66.     Given these findings, EBI concluded that the Property's façade required over $14 million in repair costs, including major repairs to the Property's windows, granite panels, copper spandrel panels, stucco, masonry, and cast stone, all of which make up the Property's exterior.

67.     The rest of the other immediate and short-term repairs required at the Property primarily concerned the Property's HVAC systems, which required extensive replacements.

68.     These necessary repairs at the Property were the direct result of Borrower and Property Manager's intentional deferred maintenance at the Property.

69.     Property Manager was responsible for identifying these issues and informing Borrower that they needed to be addressed. Pursuant to Section 2.2 of the Property Management Agreement, Property Manager was required to "manage, repair, maintain and operate the Property in the best interests of [Borrower], in an efficient manner, in good faith and diligently in accordance with sound, reasonable and prudent property management practices, in compliance with applicable law, equal to the standard of care provided by office management companies for similar buildings and properties of similar quality located in the near vicinity of such building." Under Section 6.2 (e) of the Property Management Agreement, Property Manager was also required to promptly investigate and give notice to Borrower of any damage to the Property, and under Section 2.2 (i), Property Manager and Borrower were required to give notice of all relevant information relating to the Property to each other.

70.     The representations and obligations of the Property Manager and Borrower set forth in the Property Management Agreement, along with Section 1(c) of the Recourse Guaranty, which prohibits willful misconduct leading to physical waste of the Property, made it incumbent on Borrower to promptly inform the Lender of any damage and the Property Manager to make the repairs. However, Borrower and its affiliate Property Manager failed to live up to their obligations. Instead, opting to let the Property fall into waste.

**E.**     **Lender Notices Borrower and Guarantor of Their Defaults**

71.     Borrower's failure to maintain and repair the Property violated its responsibilities under the Amended Loan Agreement.

72.     Under Section 8.4 of the Amended Loan Agreement, Borrower covenanted to "maintain the Project in condition similar to that of other comparable class-a office buildings in the Seattle, Washington area and promptly repair any damage or casualty."

73.     However, EBI's PCA revealed that Borrower neither promptly repaired damage at the Property nor kept the Property in condition similar to that of other "comparable class-a office buildings in the Seattle, Washington area."  Instead, upon information and belief, Borrower was aware of the severe issues with the Property's façade and chose to do little to remedy that defect.

74.     Consequently, the Property's façade further degraded under Borrower's watch, inflicting millions of dollars in damage to the Property.

75.     After discovering these facts from EBI's PCA, Lender sent Borrower and Guarantor a Notice of Breach, dated August 5, 2025 (the "Notice of Breach"), concerning Borrower's defaults under the Amended Loan Agreement.

76.     In the Notice of Breach, Lender detailed Borrower's obligations under Section 8.4 of the Amended Loan Agreement and stated that Borrower had breached its covenant to promptly repair and maintain the Property given the findings of EBI's PCA.  The Notice of Breach further explained that, under Section 9.4 of the Amended Loan Agreement, Borrower had thirty (30) days to cure its breach of Section 8.4, or a new and continuing Event of Default would occur under the Amended Loan Agreement.

77.     Lender also detailed in its Notice of Breach that Borrower's failure to maintain the Property created potential liability for Guarantor.

78.    Lender stated that under the Recourse Guaranty, Guarantor agreed to indemnify Lender for its losses arising out of "willful misconduct by Borrower . . . which results in physical damage or waste to the [Property]."  This liability plainly extended to Borrower's failure to repair the Property to address the known leaks that were eroding the Property's façade.

79.    With respect to the Carry Guaranty, Lender further confirmed in the Notice of Breach that the Carry Guaranty remained in effect.  Lender stated that its due diligence at the Property had confirmed that Guarantor had never satisfied the Carry Guaranty's Tender Requirements.

80.    Lender specified that Guarantor failed to meet Tender Requirements (viii) and (xvii).  The former required Borrower to certify, subject to Lender's verification, that "there exist no expenses for which Borrower or any Affiliate of Borrower is responsible, whether for capital items or Operating Expenses, relating to the Property, which are unpaid and in respect of which [Lender] is obliged to assume liability . . . ."  The latter required Guarantor to have paid "[a]ll sums then due and payable under [the Carry] Guaranty and . . . each other Guaranty," as calculated by Lender.

81.    However, given the drastic sums required to repair the Property, Lender explained that Borrower's certification under Tender Requirement (viii) was false and misleading, and that because Guarantor never paid off the amounts owed under the Recourse Guaranty, Guarantor had not satisfied Tender Requirement (xvii).

82.    At the end of its Notice of Breach, Lender informed Borrower and Guarantor that if Borrower did not cure its breach under the Amended Loan Agreement, Lender was prepared to enforce its rights and remedies at the Property, including under the Recourse Guaranty and Carry Guaranty.

83.    To date, neither Borrower nor Guarantor ever undertook any efforts to cure Borrower's breach of Section 8.4 of the Amended Loan Agreement at the Property.

84.    Accordingly, on September 5, 2025, more than thirty (30) days after its Notice of Breach, Lender sent a notice of default (the "Notice of Default"), explaining that because Borrower failed to cure its breach of Section 8.4 of the Amended Loan Agreement, a new Event of Default had occurred under the Amended Loan Agreement.  This Event of Default was in addition to Borrower's failure to repay the Amended Loan in full on its Initial Maturity Date, September 9, 2024.

85.    In its Notice of Default, Lender reiterated that the events giving rise to Borrower's default under the Amended Loan also triggered liability for Guarantor under the Recourse Guaranty and Carry Guaranty.  Lender therefore demanded in its Notice of Default that Guarantor pay those amounts owed under the Carry Guaranty and Recourse Guaranty within ten (10) business days of its Notice of Default.

86.    For the Recourse Guaranty, Lender demanded the payment of $17,213,943, which represented the amount required to remedy the physical damage and waste at the Property caused by Borrower's willful misconduct and its refusal to repair the Property as required by the Amended Loan Agreement.

87.    Lender also demanded $30,907,202.30 under the Carry Guaranty.  This amount represented the full amount of the Amended Loan—now owed as Debt Service—but limited to the Carry Guaranty Cap, or "$30 million . . . plus all reasonable out-of-pocket costs and expenses (including court costs, reasonable attorneys' fees, investigative costs and all other reasonable out-of-pocket costs and expenses actually incurred by [Lender] in the enforcement of or preservation of [Lender's] rights under this Guaranty)."

88.     Guarantor failed to pay these amounts owed to Lender within the ten (10) business days required by the Recourse Guaranty and Carry Guaranty.

89.     Accordingly, these amounts are due and owing to Lender under the Recourse Guaranty and Carry Guaranty.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Guarantor)

90.     Lender repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

91.     On September 12, 2017, Lender and Guarantor entered into the Recourse Guaranty.

92.     The Recourse Guaranty is a valid and enforceable contract.

93.     The Recourse Guaranty defines certain events and bad acts as Limited Recourse Obligations, whereby Guarantor is "fully and personally liable for, and shall defend, indemnify and hold harmless [Lender] from and against, any actual out-of-pocket loss, cost (including reasonable attorneys' fees and expenses), expense, claim, liability, judgment, award, obligation, penalty, action, suit, disbursement or damage suffered by [Lender]."

94.     One such Limited Recourse Obligation is Guarantor's agreement to be liable to, and indemnify, Lender for any losses arising out of "willful misconduct by Borrower, any Borrower Affiliate or Guarantor which results in physical damage or waste to the [Property]."

95.     Guarantor also agreed to fully indemnify Lender for any losses arising from any "willful and material misrepresentation by Borrower, any Borrower Affiliate, or Guarantor in connection with the Loan." As a Borrower Affiliate, the Property Manager had a duty not to make a material misrepresentation and was responsible for adequately informing the Borrower of any damage to the Property. Pursuant to Section 1(c) of the Recourse Guaranty, which protects Lender from willful misconduct of the Borrower or Borrower Affiliate resulting in physical waste,

Borrower was obligated to inform the Lender of such damage, and not simply allow the property to fall into waste.

96.    The Recourse Guaranty is absolute, with Guarantor "absolutely, unconditionally and irrevocably guarantee[ing] to [Lender], the prompt, full and complete payment and/or performance of the Limited Recourse Obligations and the Full Recourse Obligations, as applicable, and agrees to pay any and all reasonable out-of-pocket expenses (including reasonable counsel fees and expenses) actually incurred by [Lender] in enforcing any rights under this [Recourse] Guaranty (such expenses, together with all of the Limited Recourse Obligations and all of the Full Recourse Obligations, being the 'Guaranteed Obligations')."

97.    Guarantor further agreed that if Borrower failed to pay the Guaranteed Obligations "when due and owing," then "Guarantor will promptly pay the same, upon written demand . . . no later than ten (10) Business Days following the giving of a written demand therefor."

98.    In performing due diligence on the Property, Lender discovered in 2025 that Borrower breached its covenant under Section 8.4 of the Amended Loan Agreement to maintain and promptly repair the Property.

99.    Despite the fact that Property faced large-scale problems with water intrusion into the Property through its windows and exterior walls, Borrower took no action to comprehensively repair the Property's façade.

100.    Instead, Borrower undertook little more than band-aid repairs, which were insufficient to stem the tide of water pouring into the Property and causing widespread damage.

101.    Property Manager, as Borrower's Affiliate, was required to maintain the Property and inform Borrower of any damage to the Property. Upon information and belief, Borrower was aware of the damage being done to the Property, but Borrower failed to take action to remedy the

persistent water intrusion, as Borrower did not wish to shoulder the financial burden of the repairs it had agreed to undertake pursuant to the Amended Loan Agreement. Neither Borrower nor Property Manager informed Lender of the damage, allowing the Property to deteriorate into waste.

102.    Upon information and belief, Borrower and Guarantor hoped that following Guarantor's purported tender of the Property, Lender would take possession of the Property and that the damage caused by Borrower's deliberate inaction would be Lender's problem, not Borrower's or Guarantor's problem.

103.    On September 5, 2025, after Borrower failed to cure its breach of Section 8.4 of the Amended Loan Agreement, Lender demanded that Guarantor pay it $17,213,943, which represented the amount required to remedy the physical damage and waste at the Property caused by Borrower's willful misconduct and its refusal to repair the Property as required by the Amended Loan Agreement.

104.    To date, Guarantor has not paid any monies to Lender due and owing under the Recourse Guaranty.

105.    Accordingly, Lender has been damaged in an amount to be determined at trial, but in no event less than $17,213,943.

106.    Lender is also entitled to its attorneys' fees and costs incurred in enforcing its rights under the plain language of the Recourse Guaranty. Accordingly, as Lender continues to incur enforcement costs under the Recourse Guaranty, its damages amount will increase as well.

### SECOND CAUSE OF ACTION
**(Breach of Contract Against Guarantor)**

107.    Lender repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

108.    On September 9, 2022, Lender and Guarantor entered into the Carry Guaranty.

22

109.    The Carry Guaranty is a valid and enforceable contract.

110.    Pursuant to Section 2(a) of the Carry Guaranty, Guarantor guaranteed "the full payment of (i) all Operating Expenses incurred in connection with the customary operation of the Project (including all real estate taxes and assessments and insurance premiums for the insurance coverages required pursuant to the terms of the Loan Agreement), (ii) Debt Service and (iii) TI/LC Expenses, in each case, as and when the same become due and payable and prior to delinquency solely to the extent Operating Revenue is not otherwise sufficient to pay items (i), (ii) and/or (iii), regardless of whether the Maturity Date has occurred or whether there has been an acceleration of the Loan and solely to the extent that such amounts are due and payable prior to the Carry Guaranty Expiration Date . . . ."

111.    The Carry Guaranty is absolute, with Guarantor "irrevocably and unconditionally guarantee[ing] to [Lender] and its successors and assigns the payment of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise, in accordance with and subject to the terms of this Guaranty."

112.    The Carry Guaranty Cap defined in Section 2(c) of the Carry Guaranty limits Guarantor's potential exposure under the Carry Guaranty to "$30,000,000.00 . . . plus all reasonable out-of-pocket costs and expenses (including court costs, reasonable attorneys' fees, investigative costs and all other reasonable out-of-pocket costs and expenses actually incurred by [Lender] in the enforcement of or preservation of [Lender's] rights under this Guaranty)."

113.    The Carry Guaranty can expire under certain conditions, such as if Guarantor meets the Tender Requirements set forth in Schedule A to the Carry Guaranty.

114.    These Tender Requirements are structured to ensure that following tender, Lender can take possession of the Property free of any unexpected encumbrances or expenses.

115.    However, Guarantor never successfully satisfied the Tender Requirements.

116.    In particular, Guarantor failed to satisfy Tender Requirements (ii), (viii) and (xvii).

117.    Tender Requirement (ii) required Borrower to deliver a "grant deed, with covenants against grantor's acts, conveying…Borrower's interests in the Property, subject to no liens or encumbrances other than the respective liens of the Mortgage and the other Loan Documents…"

118.    Guarantor, instead, submitted a bargain and sale deed in lieu of foreclosure, which is not the deed that was required under Tender Requirement (ii).

119.    Tender Requirement (viii) required Borrower to certify, subject to Lender's verification, that "there exist no expenses for which Borrower or any Affiliate of Borrower is responsible, whether for capital items or Operating Expenses, relating to the Property, which are unpaid and in respect of which Transferee is obliged to assume liability . . . ."

120.    Guarantor purported to provide this certification to Lender, but given the significant repair sums Borrower owed under Section 8.4, the certification was false and misleading.

121.    In addition, Tender Requirement (xvii) required Guarantor to have paid "[a]ll sums then due and payable under [the Carry] Guaranty and . . . each other Guaranty," as calculated by Lender.

122.    As discussed above, however, Guarantor is liable to Lender under the Recourse Guaranty for its purposeful inaction that caused damage and waste at the Property.

123.    Guarantor never paid the amount owed under the Recourse Guaranty as part of its tender.

124.    Consequently, Guarantor never satisfied the Tender Requirements, and the Carry Guaranty remains in effect.  And the Property remains in the possession and control of Borrower.

125.    Because the Carry Guaranty remains in effect, Guarantor is liable to Lender for "the full payment of (i) all Operating Expenses incurred in connection with the customary operation of the Project (including all real estate taxes and assessments and insurance premiums for the insurance coverages required pursuant to the terms of the Loan Agreement), (ii) Debt Service and (iii) TI/LC Expenses."

126.    The Amended Loan matured on September 12, 2024, and as a result, the amount owed by Guarantor under the Carry Guaranty exceeds the Carry Guaranty Cap, which limits Guarantor's exposure to $30 million "plus all reasonable out-of-pocket costs and expenses (including court costs, reasonable attorneys' fees, investigative costs and all other reasonable out-of-pocket costs and expenses actually incurred by [Lender] in the enforcement of or preservation of [Lender's] rights under this Guaranty)."

127.    Accordingly, on September 5, 2025, Lender demanded that Guarantor pay it $30,907,202.30 under the Carry Guaranty.  This amount represented the Carry Guaranty Cap plus Lender's reasonable out-of-pocket expenses in enforcing its rights under the Carry Guaranty.

128.    Lender gave Guarantor ten (10) business days to pay such amounts owed.

129.    Guarantor has not paid any monies owed under the Carry Guaranty.

130.    Accordingly, Lender has been damaged in an amount to be determined at trial, but in no event less than $30,907,202.30.  As Lender continues to incur costs and expenses in enforcing its rights under the Carry Guaranty, Lender's damages will only continue to increase.

**WHEREFORE,** Lender respectfully requests judgment as follows:

1. With respect to the first cause of action, monetary damages against Guarantor in an amount to be determined at trial, but not less than 17,213,943.00, plus Plaintiff's reasonable attorneys' fees and costs;

2. With respect to the second cause of action, monetary damages against Guarantor in an amount to be determined at trial, but not less than $30,907,202.30, plus Plaintiff's reasonable attorneys' fees and costs;

3. Plaintiff's legal fees, costs, and expenses in bringing this action;

4. Interest; and

5. Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        December 1, 2025

Respectfully submitted,

**MORRISON COHEN LLP**

By:    _/s/ Y. David Scharf_____
        Y. David Scharf
        Latisha V. Thompson
        Aaron B. Lauchheimer
        Mahnoor Misbah
        909 Third Avenue
        New York, NY 10022
        (212) 735-8600

*Attorneys for Plaintiff DekaBank Deutsche Girozentrale*